STATE of South Dakota, Plaintiff
and Appellee,

v.

Byron C. DALE, Defendant
and Appellant.

No. 16057.

Supreme Court of South Dakota.

Argued Oct. 11, 1988.

Decided March 22, 1989.

See also, 439 N.W.2d 112.

Randolph J. Seiler of Seiler & Cain, Mobridge, for defendant and appellant.

Wade Hubbard, Asst. Atty. Gen., Pierre, Curtis W. Hanks, Corson County State's Atty., McIntosh, for plaintiff and appellee; Roger A. Tellinghuisen, Atty. Gen., Pierre, on the brief.

KEAN, Circuit Judge.

Byron Dale (Byron), appeals from a judgment of conviction from a jury verdict which found him guilty of grand theft by deception and attempted grand theft by deception. This appeal raises twenty issues. Defense counsel prepared and argued issues I to X. The final ten issues, all dealing with the federal monetary system, were prepared and presented by the defendant pro se. We affirm the judgment.

In his quest to have his views on the federal monetary system aired in the courts, self-proclaimed money expert Byron joined with several other individuals in founding the Commercial Trust (trust) of South Dakota. The trust did not deal in United States currency and had no affiliation with any federal agency and members placed "credit" into the trust. This credit was then used to build other credit. Byron was the secretary/treasurer of the trust which was located at his home.

The trust printed some credibly prepared documents by which officers could authorize "credit" to be used. In theory this "credit" could be used to purchase goods, service, products or whatever. According to Byron, if the individual accepted the document in exchange for something, the document could be sent to the trust which would issue a "bill of exchange." Presumably this bill of exchange could be used to obtain federal reserve notes.

As often occurs, fate and opportunity became helping hands to the future of Byron's plans. Byron's neighbor, Gorman Peterson (Peterson), had been ranching next to Byron for almost twenty years. The farm-ranch credit problems of the mid–1980's caught up with Peterson. As he had reached his credit limits, Peterson and the bank, his main creditor, were planning to conduct a public auction at Peterson's ranch to liquidate debts. The auction was set for May 2, 1986. Irwin and Margaret Salzer (Salzer) were hired as auctioneers.

On the morning of the auction, four men met at Byron's farm house. The meeting had been called by Byron to aid him in promoting his ideas on the monetary system. These men were: Byron; Ron Craig (Craig), a Baptist Minister from North Dakota; Lloyd Dale (Lloyd), defendant's brother from Lemmon, South Dakota; and Alfonse Friese (Friese), a seventy-one year old retired farmer. The agreed purpose of the meeting, according to Byron's own words, was to bid "on some property so I could address the money issue." The scheme devised was outwardly simple. Craig, Friese and Lloyd were to proceed to the auction sale, secure bidder's numbers, and bid on items offered at Peterson's farm auction. Byron went to the auction, but

made no bids. The trio was specifically directed to buy "big ticket" items to create attention at the auction.

The bidders were very successful and made numerous high bids. After the sale Lloyd and his companions loaded the smaller items into a pickup and took them to Byron's ranch. No one returned to the auction site. Later that day Salzer called Byron's ranch and requested that someone come to the Peterson ranch to pay for and pick up the items purchased by Lloyd, Craig and Friese.

Byron and Lloyd left Byron's ranch and returned to the Peterson's ranch. Upon their arrival Lloyd went into a mobile home used as the auction office. A list of sale items was presented by Salzer. Lloyd produced an item which had the appearance of a check book. Lloyd filled in one of the documents which was contained in this check book and which had previously been signed by Byron. One of the blanks filled in on the document was the sales sum of $7,630.75 representing Lloyd's bids. Lloyd removed the document, folded it and placed it on the table. He then departed, got into Byron's truck and left the Peterson ranch. When Salzer looked at the document, he realized it was not a check.

The following day, Salzer and Tom Peterson, Gorman's son, went to Byron's ranch to find Lloyd. They met Byron, who, when told of the nature of their presence, stated that they were really looking for him. The document given by Lloyd the prior day was discussed. Byron told them just to deposit the item in the Dewey County Bank. He also told them that in a few days he would pay for the items bid on by Craig and Friese.

On the following Monday, Byron sent a similar document by certified mail to Peterson and Salzer to cover the Craig and Friese auction items. This document contained a figure of $37,050.00 for items bid. Salzer attempted to clear these documents through the Dewey County Bank. The president of the bank, Thomas Schirber (Schirber) did not think the documents to be checks. He called the Federal Reserve System and learned that the numbers on the bottom of Byron's instruments were not normal routing numbers. He also called the State Banking Commission and learned that the Commercial Trust was not a registered financial institution in South Dakota. Neither Peterson nor Salzer received payment on Byron's documents.

When pressed for payment, Byron continually insisted that the documents were good and that Salzer should run them through his bank. Byron also declined to return those items taken from the auction. Rather boldly, Byron even drove to Peterson's ranch and tried to take the remaining items Lloyd, Craig and Friese had bid upon. Tom Peterson told Byron he could have the items when he gave him real money.

Throughout this time Byron expected to be sued by Gorman Peterson. He then planned to use the courts to correct the monetary system. Instead Byron was indicted for grand theft and attempted grand theft. He was convicted by a Lawrence County jury on both counts. This appeal ensued.

I.

█ Prior to trial, the state sought to restrict Byron's use of the trial as his own political forum on the monetary issue and filed a motion in limine asking:

> [F]or an Order instructing each defendant[1] to refrain during the trial of the above-captioned case, from asking questions, making statements, referring to, or in any way introducing evidence attacking the monetary system of the United States, or the powers of the United States Congress to declare what shall be legal tender for all debts.

The motion to preclude the evidence was granted by the trial court. This issue and several others which touch it revolve around the matter of relevancy[2] and the

---

1. Byron was indicted alone on the attempted grand theft charge and on the grand theft charge conjointly with Lloyd Dale, Ron Craig and Alfonse Friese. They were tried in Law-

rence county after a change in venue was allowed from Corson county.

2. 19-12-1 (Rule 401):

trial court's decision to limit preparation for and presentation of a legal defense. In this regard we do not believe the trial court erred.

In *State v. McNamara*, 325 N.W.2d 288 (S.D.1982), the defendant was charged with grand theft of livestock from his place of employment at a feedlot. After the state's rebuttal evidence, the defendant attempted to call four witnesses to testify concerning the memory of the rebuttal witnesses. The request was denied. In writing for the Supreme Court, Chief Justice Dunn wrote:

Questions as to the relevance of proffered testimony, *such as that available from appellant's witness*, are committed to the discretion of the trial court and are not grounds for reversal or a new trial unless abuse is clearly demonstrated. *Weiby v. Wente*, 264 N.W.2d 624 (Minn. 1978). Opinions of others as to the lot manager's memory were immaterial to the question of guilt or innocence of grand theft of livestock. Appellant had ample opportunity to cross-examine the lot manager's memory and additional testimony on the subject was not crucial to appellant's case. Thus, we reaffirm our view that the question of whether evidence is immaterial, conjectural or remote must be left to the practical judgment of the trial court and rests largely in its discretion. *Drier v. Perfection, Inc.*, 259 N.W.2d 496 (S.D.1977). (emphasis added).

325 N.W.2d at 291.

More recently in *State v. Grooms*, 399 N.W.2d 358 (S.D.1987), a case involving grand theft, this court continued to hold that "Relevance is a precursor to the admittance of any evidence,...." *Id.* at 361. In *Grooms* the preclusion of evidence was applied to the defendant's attempt at "unfettered cross-examination" of a key state witness. The defendant sought to elicit testimony concerning the witness' alleged abuse of the defendant's children. While recognizing the right to confront wit-

nesses and to cross examine and impeach them, this court also held:

A trial court's discretion may be exercised at the expense of excluding relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." SDCL 19–12–3.

399 N.W.2d at 362. *See also, State v. Olson*, 408 N.W.2d 748 (S.D.1987); *State v. Stavig*, 416 N.W.2d 39 (S.D.1987); *State v. McDowell*, 391 N.W.2d 661 (S.D.1986); and *Sabag v. Continental South Dakota*, 374 N.W.2d 349 (S.D.1985). *See generally,* Weinstein, Evidence (1988), Vol. 1, pp. 403–1 to 403–82.

Turning then to the nature of the evidence Byron sought to introduce at trial, i.e., a challenge to the United States monetary system, we need to determine whether it was a defense which the jury could properly consider in a criminal case.

In *United States v. Rifen*, 577 F.2d 1111 (8th Cir.1978), the defendant sought to introduce evidence as to his beliefs on certain aspects of the Federal Reserve System and art. I, § 10 of the United States Constitution which discusses legal tender. In declaring that these issues were not allowable, the Court of Appeals wrote:

No such evidence was necessary. Congress has declared federal reserve notes legal tender, 31 U.S.C. § 392, and federal reserve notes are taxable dollars. *See United States v. Daly*, 481 F.2d 28 (8th Cir.), *cert. denied*, 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973); *United States v. Schmitz*, 542 F.2d 782 (9th Cir. 1976), *cert. denied*, 429 U.S. 1105, 97 S.Ct. 1134, 51 L.Ed.2d 556 (1977); *United States v. Wangrud*, 533 F.2d 495 (9th Cir.), *cert. denied*, 429 U.S. 818, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). The specific answer to Rifen's argument is that article I, section 10 of the United States Constitution prohibits the states from declaring legal tender anything other than gold or silver, but does not limit Con-

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

gress' power to declare what shall be legal tender for all debts. The *Legal Tender Case,* 110 U.S. 421, 446, 4 S.Ct. 122, [128], 28 L.Ed. 204 (1884); *Chermack v. Bjornson,* 302 Minn. 213, 223 N.W.2d 659 (1974), *cert. denied,* 421 U.S. 915, 95 S.Ct. 1573, 43 L.Ed.2d 780 (1975).

577 F.2d at 1112–13.

On three occasions this court has had a similar opportunity to rule upon the challenge to the United States monetary system and the Federal Reserve System. In *City of Colton v. Corbly,* 323 N.W.2d 138 (S.D.1982), the defendant, who was involved in a dispute over a zoning fee with the City of Colton, claimed it was impossible for her to pay a fee because dollars represented federal reserve notes which could not be redeemed *in specie* in violation of the federal constitution. In affirming the trial court's ruling, this court wrote:

> Although art. 1, § 10 constitutes a limitation on the power of the states, the constitution does not limit Congress' power to declare what shall be legal tender for all debts. *Julliard v. Greenman,* 110 U.S. 421, 446–50, 4 S.Ct. 122, 128–31, 28 L.Ed. 204, 213–15 (1884). Congress has declared that federal reserve notes constitute legal tender for all debts. 31 U.S.C. § 392 (1976). In recognition of established legal principle, we conclude that appellant's contention regarding payment of the fee is without merit. *See United States v. Rifen,* 577 F.2d 1111 (8th Cir.1978); *United States v. Wangrud,* 533 F.2d 495 (9th Cir.1976), *cert. denied,* 429 U.S. 818, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976); *Brubrad Company v. United States Postal Service,* 404 F.Supp. 691 (E.D.N.Y.1975); *Kauffman, v. Citizens State Bank of Loyal,* 102 Wis.2d 528, 307 N.W.2d 325 (Ct.App. 1981); *Allen v. Craig,* 1 Kan.App.2d 301, 564 P.2d 552 (1977); *Chermack v. Bjornson,* 302 Minn. 213, 223 N.W.2d 659 (1974), *cert. denied,* 421 U.S. 915, 95 S.Ct. 1573, 43 L.Ed.2d 780 (1975); *Radue v. Zanaty,* 293 Ala. 585, 308 So.2d 242 (1975); *Leitch v. State Department of Revenue,* 16 Or.App. 627, 519 P.2d 1045 (1974).

323 N.W.2d at 139.

This holding has been followed in *Wikle v. City of Rapid City,* 347 N.W.2d 584 (S.D.1984) (a magistrate court order is not void because it required payment of speeding fine in "Federal Reserve" notes rather than gold and silver coin) and *First Nat'l Bank of Black Hills v. Treadway,* 339 N.W.2d 119 (S.D.1983) (the bank's use of legal tender prescribed by Congress is not state action prohibited by art. 1, § 10 of U.S. Const. forbidding use of anything but gold or silver coins as tender in payment of debt). *See also, Union State Bank v. Miller,* 335 N.W.2d 807 (N.D.1983), *citing City of Colton v. Corbly, supra.*

We hold that the issue of the propriety of the United States monetary system and Federal Reserve System is a matter governed and well settled by federal law and federal cases. Byron's disagreement with this interpretation of the federal constitution and his disagreement with the present form of the monetary system and federal law does not automatically mean it is an appropriate defense to raise. Such evidence would only serve to confuse the issues and mislead the jury into believing that it could rule and decide the correctness of the monetary system. The ruling by the trial court on this matter was correct.

In so ruling we recognize the distinction between one who willfully defies a statute and rejects a known duty from those who act from ignorance or misunderstanding. This distinction is clearly pointed out in *United States v. House,* 617 F.Supp. 232, 234 (W.D.Mich.1985) wherein it was held:

> Clearly, such evidence as tends to establish *only* that defendant believes that the tax laws are unconstitutional, or that he disagrees with such laws, must be excluded. However, to the extent that proffered evidence tends to establish that defendant misunderstood his legal obligation, *regardless of the correctness or credibility* of purported "misunderstandings," defendant must be allowed to introduce such evidence....

Byron did not misunderstand his obligation in this case. He has so declared at hearings and during the trial. What he does disagree with is the interpretation of the Constitution by the courts and the laws of Congress which implement the purposes of the Constitution. Because this goes only to his belief and disagreement, however, and not to misunderstanding, the preclusion of the evidence was proper.

With this issue resolved, it is now proper to consider three appeal issues which are directly related.

### A.

About one month before the trial, Byron requested that the court issue subpoenas and pay the costs and fees pursuant to SDCL 23A–14–3. A list of twenty-five names was presented. Later two more names were added and one was deleted. From this group, four subpoenas were allowed. All but twelve eventually testified. Of this twelve, Roger Craig, a co-defendant was unavailable; one was a court reporter from a prior trial; two were from the Production Credit Association whom Byron thought would testify about loan credit; and, the remaining people were all individuals who Byron wanted to use to explain his concepts of or various aspects of the monetary system issue. Included in the twelve was a United States Senator, an aide to another United States Senator and the assistant counsel for the United States Treasury from Washington, D.C.

■ The South Dakota Constitution, art. VI, § 7 guarantees that an accused shall "have the right of compulsory process for obtaining witnesses in his behalf...." *State v. Chamley*, 310 N.W.2d 153 (S.D. 1981); *State v. Wilcox*, 21 S.D. 532, 114 N.W. 687 (S.D.1908). The right is also given by statute. SDCL 23A–14–3. The federal constitution guarantees the same right. U.S. Const.Amend. 6. *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). But, limitations exist in this right.

In *State v. Wilcox, supra,* 21 S.D. at 534–36 and 114 N.W. at 688, this court held:

Such a one is entitled as a matter of right to the presence of his witnesses or every advantage of their presence, if their presence be procurable, and this necessarily includes adequate means to secure their presence or the advantages which would flow therefrom. Hence he is entitled, *under reasonable regulations,* to process for witnesses anywhere within the state, and to a reasonable opportunity to invoke the use of such process. "The law never requires impossibilities." (citations omitted) (emphasis supplied)

The *Wilcox,* decision merely anticipated later developments in the law. It recognized the right, but did not make the right absolute under all circumstances. *Wilcox* did not give a defendant the right to compel attendance and testimony of all witnesses absolutely. This was recognized in *Washington v. Texas, supra,* a case where a defendant's right to compulsory process was deemed denied:

[B]ecause the State *arbitrarily* denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he personally observed, and whose testimony would have been relevant and material to the defense. (emphasis added)

388 U.S. at 23, 87 S.Ct. at 1925. Subsequent to *Washington v. Texas, supra,* a number of state and federal decisions have held that unless the witness prevented from testifying could have produced relevant and material information benefiting the defense, no constitutional violation occurred. *See, e.g., United States v. De Stefano,* 476 F.2d 324 (7th Cir.1973); *People v. Dunigan,* 96 Ill.App.3rd 799, 52 Ill.Dec. 247, 421 N.E.2d 1319 (1981); *State v. Mitake,* 64 Haw. 217, 638 P.2d 324 (1981); and, Westen, *The Compulsory Process Clause,* 73 Mich.L.Rev. 71 (1974).

Byron relies upon the decision of *State v. Brown,* 81 S.D. 195, 132 N.W.2d 840 (1965) as authority that a defendant can call witnesses of his own choosing. The facts in *Brown* are distinguishable from the facts in this case as the defendant in *Brown* was attempting to call co-defendants who re-

fused to testify and incriminate themselves. The context of compulsory process in *Brown* was such that it was not concerned with the right to exercise discretion to exclude evidence found to be irrelevant and immaterial by the trial judge. *Brown* does not control the issues of this appeal.

■ As the testimony of ten of the twelve related to monetary issues or the loaning of credit, the trial court properly denied the subpoenas since it had ruled such evidence was not relevant. One witness, Craig, was unavailable and to issue a subpoena for him would have been an empty task. As to the court reporter, Byron requested the wrong person. The court reporter had prepared transcripts of prior proceedings and these transcripts were in the clerk's file in McIntosh, South Dakota. The subpoena should have been directed to the clerk not the reporter. It was Byron's intent to use the transcripts to impeach, even though he had no idea whether any such material existed in the transcripts. No dispute existed as to the correctness in the preparation of the transcripts. Thus, he subpoenaed the wrong person and there was no error in this regard.

### B.

■ One of the state's witnesses was Tom Schirber (Schirber), who testified at some length. At the conclusion of the state's examination, Schirber told the court that he could not appear the next day. Even though it was at the end of the day, the trial continued with Schirber on the stand who was then subjected to: cross-examination by Byron's counsel, cross-examination by Byron, redirect examination by the state, re-cross-examination and several more rounds of redirect and re-cross. He was then excused.

Byron then sought to subpoena Schirber claiming he had testimony which would "dovetail" into the testimony of one of his witnesses. After some time Byron finally admitted he wanted Schirber to testify about matters concerning the monetary system which would be the same as or similar to his upcoming witness.

Under these circumstances we do not believe error occurred. Schirber was a witness at trial and was subject to several cross-examinations. These examinations were extensive and complete. Byron has not shown this court nor does he argue that his cross-examination was restricted in any impermissible fashion except as to relevancy. If anything, the court allowed the questioning even to infringe some upon its prior relevancy order just to ensure that the cross-examination was full and complete knowing that Schirber would not be present the next day. It seems that Byron sought to have Schirber appear in juxtaposition with his witness for appearance sake rather than to elicit substantive matters. He readily admitted that another witness would give the same testimony. He also agreed that it dealt with issues previously ruled as irrelevant. But, he made no offer of proof on this testimony and did not point out what additional testimony might be gleaned from his reappearance that had not already been given in the nearly fifty pages of transcript.

We find no error as full examination of the witness was allowed during the course of the trial.

### C.

Byron on his own, and against his counsel's consent and advice, submitted ten appeal issues for the court to consider. Since all these issues deal with the monetary system previously ruled as irrelevant, and we agree with the trial court on this issue, these issues will not be further considered. The court's prior comments fully decide and dispose of these matters.

### II.

Byron was convicted of violating SDCL 22–4–1, 22–30A–3(1) and 22–30A–17.[3] He

---

**3.** 22–4–1:

Any person who attempts to commit a crime and in the attempt does any act toward the commission of the crime, but fails or is prevented or intercepted in the perpetration thereof, is punishable where no provision is made by law for the punishment of such attempt, as follows:

challenges these convictions claiming SDCL ch. 22–30A is unconstitutionally vague, indefinite and uncertain. The thrust of his argument centers upon the failure of the criminal statutes to define certain terms, such as "defraud" and "false impression." He urges that, since several people might come to different conclusions as to which acts fall within the meaning of these terms, the statute is vague and uncertain in a constitutional sense.

The concept of vagueness and uncertainty has been considered on several prior occasions in this state. In *State v. Primeaux*, 328 N.W.2d 256 (S.D.1982), a case involving a crime of second degree murder, it was held:

> A crime must be statutorily defined with definiteness and certainty. A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. A criminal statute must give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden. (citations omitted)

328 N.W.2d at 258 (quoting from the prior decision of *State v. Bad Heart Bull*, 257 N.W.2d 715 (S.D.1977)).

This same reasoning was followed in *State v. Big Head*, 363 N.W.2d 556 (S.D. 1985), a vehicular homicide case, wherein it was again held:

> Statutes violate due process when the prohibited act or omission is expressed in terms so vague that reasonable people of ordinary intelligence might apply them

differently. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839 31 L.Ed.2d 110 (1972); *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954). Criminal statutes must adequately apprise the public of the activity proscribed and must set out "explicit standards" for endorsement or, in other words, define the criminal offense with "sufficient definiteness." *Kolender v. Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Most importantly here, the statutory language may not be so vague that selective or discriminatory enforcement is permitted. *Kolender, supra; Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *Coates v. City of Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).

363 N.W.2d at 559.

■ It is realized that criminal laws represent a legislative balancing act in many instances. In an attempt to prohibit certain conduct, the laws are usually written in a fashion to give broad application to the type of conduct sought to be forbidden. There is nothing inherently wrong with a broad application; for otherwise, there would exist a criminal law for each specific act. What is not allowed are laws so general in nature that people of ordinary intelligence may apply them differently.

■ Admittedly, the scope of SDCL 22–30A–3(1) is comprehensive. But then, the scope and reach of schemes to cheat and defraud are also complex and complicated and are restricted only by the imagination

---

(1) If the attempted crime is punishable by imprisonment in the state penitentiary for five years or more, ... for a term not exceeding one-half the longest term of imprisonment prescribed upon a conviction for the attempted crime;

. . . . .

22–30A–3(1):

Any person who obtains property of another by deception is guilty of theft. A person deceives if with intent to defraud he:
(1) Creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a

promise shall not be inferred from the fact alone that he did not subsequently perform the promise;

. . . . .

The term "deceive" does not, however, include falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive reasonable persons.

22–30A–17:

Theft is grand theft, if:
(1) The value of the property stolen exceeds two hundred dollars;

. . . . .

... Grand theft is a Class 4 felony.

of those who prepare and execute them. Moreover, a criminal law need not define every word used to prohibit a certain conduct. The words the legislature used are presumed to convey their ordinary and popular meaning. *State v. Big Head, supra,* 363 N.W.2d at 559.

■ There can be no argument about the meaning of the words "intent," "obtain," "person," and "property of another." All are defined in SDCL 22–1–2. As to the word "deception," it means and comes from the word "deceive" a common word known to any intelligent person. The same can be said of the word "defraud" and the phrase "false impression." "Defraud" means to take property by a calculated trickery, deception or alteration of the truth. "False" means, among other things, something that is intentionally untrue.[4] All these words have an everyday, common usage.

In *State v. Martin,* 85 S.D. 587, 187 N.W.2d 576 (1971), a security sales fraud case, this court found SDCL 47–31–128 (then SDC 55.9913 (1961)) as an adequate expression of the will of the legislature even though key words of the statute were not elsewhere defined. The court determined that it was incumbent upon the defendant, if he does not understand the law, to learn its content and meaning. The law charges every man with the knowledge of the standards prescribed by the law.

■ A review of the statute leads to the conclusion that SDCL 22–30A–3(1) is neither vague nor ambiguous. The statute requires acts of deception to obtain another's property. The statute goes on to require "intent" and states that such "intent to defraud" exists if a person "creates or reinforces a false impression." Certainly in this case Byron wanted to obtain the property at the farm sale. Byron did so by preparing and presenting a document which appeared to be a check—an instrument normally used to buy items at an auction. Byron told no one about his own Commercial Trust. Byron brought in others to help complete the fraud, because he knew people might not trust him. The fact

Byron did not know of the statute, did not believe his actions were wrong, or, was driven by his own good intentions is immaterial. Any intelligent person looking at Byron's conduct as applied to this statute would find his actions prohibited and falling within the language of SDCL 22–30A–3(1).

### III.

■ During the state's closing argument to the jury, in fact almost at the end of the argument, the prosecutor told the jury: "[T]hat if it's not stopped now, here and now, he will do it again tomorrow, the day after and the day after and the day after." A general objection was made and overruled by the court. The prosecutor then continued briefly by stating: "And it's time to stop it so that next time instead of Gorman and Tom Peterson, it will be someone else and maybe someone in Lawrence County."

Byron claims that these remarks by the prosecutor require that a new trial be granted. We disagree for two reasons.

In *State v. Dace,* 333 N.W.2d 812 (S.D. 1983), a case involving attempted rape and aggravated assault, the prosecutor asked the jury to imagine their own children being victims and sitting on the witness stand. Although an objection was made, neither a request to admonish the jury nor a motion for a new trial was made. In holding the issue was not preserved for appeal, this court wrote: "He did not give the trial court an opportunity to make a decision from which there could be an abuse of discretion. Defendant has therefore not preserved this issue for appeal...." 333 N.W.2d at 822.

Similarly in this case, there was no ruling upon a motion for a new trial, there is no abuse of discretion. A general objection, without more is inadequate to preserve the issue for appeal.

■ Byron claims these remarks were prejudicial error. In *State v. Kidd,* 286 N.W.2d 120 (S.D.1979), we held that there is no hard and fast rule as to when prose-

---

**4.** Webster's Third New International Dictionary (1981).

cutorial misconduct reaches the level of prejudicial error[5] as each case must be decided upon its own facts. There must be a showing of abuse of discretion from the denial of a motion for a new trial. This is not to say that the state may hide behind the harmless error rule for to do so would merely justify the unfairness that occurred during the trial. *State v. Webb*, 251 N.W. 2d 687 (S.D.1977). But, it must be shown that the statements were so detrimental to a defendant's right to a fair trial. In this regard the strength of the state's evidence is a factor to consider. *State v. Havens*, 264 N.W.2d 918, 923 (S.D.1978); *State v. Kidd, supra*, 286 N.W.2d 122.

The evidence in this case is undisputed even by Byron. The date and time of the occurrence are agreed to by all; the fact that property of a value over $200.00 was taken is agreed upon; the ownership is undisputed; and, the use of the "check" is conceded by Byron. There exists no dispute over what occurred to establish the elements of the crime charged. About the only area of disagreement was the legal effect of the "check" and Byron's insistence to use the courtroom as his forum to express his beliefs on the monetary system. He had such a fervor on this topic that he was willing to conspire and breach a public law in order to generate interest in his cause. Unfortunately the criminal courts were not receptive to his desires and thwarted his plan to demonstrate the need for monetary reform. But, the evidence is still on record to sustain the conviction. It is strong and overwhelming. It is doubtful whether this set of remarks had any real impact upon the jury's decision as prejudicial error must. For unless it has such an impact, it is not prejudicial error. *State v. Rosales*, 302 N.W.2d 804, 807 (S.D.1981).

However, prosecutors are reminded that each defendant has the right to a fair trial. *State v. Kidd, supra*, 286 N.W.2d at 123. And by this decision, we instruct prosecutors to refrain from arguing that a defen-

dant should be convicted of a crime because of what might occur in the future. This makes a defendant defend against uncharged, unproven and unrelated charges which are all outside of the issues of the case. *State v. Kidd, supra*, 286 N.W.2d at 121. Under the facts of another case where the evidence is not so strong, the remarks can be prejudicial error.

## IV.

While not required to do so, Byron took the witness stand in his own defense. The testimony concerning his monetary views was consistent with his pretrial position, in that he intended to use the courts to relate his views on the monetary system. He admitted this was the:

> [T]hird time that I have really tried to address this in a very active way. The first two times I have been assaulted by police officers and the second time beaten up quite bad (sic) and every time it resulted in basically the same thing. They just sweep it under the rug and the first time just nothing (sic) became of it. The second time I lost a three thousand acre ranch and I though that if there was (sic) more people involved in it, it would be harder to just sweep it under the rug and rough me up and go on and not address any of the issues that I want to address.

(Trial Testimony of Byron Dale.)

As the readers of this opinion could anticipate, the prosecutor launched into his cross-examination with vigor. Prompted by the claims of police beatings, but without any factual basis for these statements, the prosecutor sought to ascertain the reasons for these claims. Byron began the cross-examination in an unresponsive fashion by at first denying he would use any means to get this issue before the court and then claiming he "never beat anybody up or tried to kill them." Over the protests of Byron, the case of *Dale v. Janklow*, 828 F.2d 481 (8th Cir.1987)[6] was brought up

---

5. This type of error must be contrasted to certain types of error which require an automatic reversal. *See, e.g., State v. Brown, supra*, reversible error to call attention to defendant's failure to testify.

6. In this case Byron sued a host of state officials under 42 U.S.C. § 1983 (1982). The whole his-

which involved one of the "beatings" Byron had received. Questions were also asked about Byron barricading himself in his house on this occasion, being armed with several firearms, and saying "blood would run" before he would let policemen on his property.

It is claimed on this appeal that the cross-examination evidence elicited by the state was irrelevant. But, if relevant, it should have been excluded as more prejudicial than probative. SDCL 19–12–2 and 19–12–3. We disagree.

■■■■■ Cross-examination is governed by SDCL 19–14–19. It is limited to the subject matter of the direct examination and matters affecting credibility. The court may permit in its discretion inquiry into additional matters as if on direct examination. Cross examination, however, is not unlimited and is subject to the rules concerning relevancy found in SDCL ch. 19–12. This is especially so when evidence of other bad acts is used. *See, State v. Grooms,* 399 N.W.2d 358, (S.D.1987) and *State v. Eagle Hawk,* 411 N.W.2d 120 (S.D. 1987). Introduction of such extrinsic evidence is allowed if:

(a)  Its probative value outweighs its prejudicial effect, and

(b)(1)  It falls within the guidelines of SDCL 19–12–5, or

(b)(2)  It falls within the specific instances of misconduct allowed by SDCL 19–14–10.

411 N.W.2d at 125.

■■■ We continue this issue by noting that Byron did not request the trial court to make a ruling upon the weighing of probative value versus prejudicial effect. The objection made was a general objection and not adequate to preserve the matter. SDCL 19–9–3(1). Because of this, the trial court did not have an adequate opportunity to make a ruling except upon a general objection. (Circuit judges are again cautioned that when such an objection is correctly made, the ruling shall be on the record. *State v. Eagle Hawk, supra,* 411 N.W.2d at 126.)

■■■ Assuming the error was correctly noted upon the record, we find no error in admission of the evidence. Extrinsic evidence is admissible "for other purposes, such as, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." SDCL 19–12–5. This rule of evidence does not limit the extrinsic evidence just to those instances listed as its uses the prefatory phrase "for other purposes." Use of extrinsic evidence to explain accusations made by the defendant of misconduct on behalf of state law enforcement officials is a "purpose" under SDCL 19–12–5. This is especially true when the first instance of police misconduct was raised by the defendant in his direct testimony. In *State v. Dokken,* 385 N.W.2d 493 (S.D.1986), it was held that:

> SDCL 19–12–5 expressly states that "other act" evidence may be admissible for other purposes, *some of which* are enumerated in this statute; however, this listing does not limit the scope of "other purposes" for which this evidence may be admissible.

385 N.W.2d at 497.

For some cases where evidence of "other acts" was allowed for "other purposes," especially to dispel feigned ignorance of the facts, or intent, or suggested innocent conduct, *see United States v. Benedetto,*

---

tory of his problems with Production Credit Association are set forth in detail which problems go back to the early 1980's. Part of the fear of law enforcement officials were (a) his comments on a radio show that he would carry a mini–14 rifle and shoot "as many of those sons-a-bitches" (law enforcement officials) as he could; and, (b) that Gordon Kahl, a man from North Dakota who had killed two U.S. Marshalls one month before, might be at Byron's ranch because he said he would hide him there. The federal court specifically found that the officers could reasonably conclude that he would use deadly force and that these officers could use reasonable force to prevent anticipated harm.

Byron's hostility and threatening demeanor can also be found in the case of *Northwest S.D. Production Credit v. Dale,* 361 N.W.2d 275, 278 (S.D.1985) wherein this court, Justice Henderson writing, held that execution without notice was allowable because of the strong potential for violence based upon the numerous threats of Byron Dale.

571 F.2d 1246 (2nd Cir.1978); *United States v. Billups,* 692 F.2d 320 (4th Cir. 1982); *United States v. Bent,* 707 F.2d 1190 (11th Cir.1983); and, *United States v. Burkett,* 821 F.2d 1306 (8th Cir.1987).

We therefore hold that it was not improper for the court to allow the state a limited right to cross-examine Byron about other extrinsic acts as he had initially raised and suggested misfeasance by law enforcement officers. It was an emotional appeal to the jury. He invited the cross-examination which occurred. To rule otherwise would allow him to make comment and state as fact illegal or improper police activities thereby promoting sympathy for his cause yet prevent the state from meeting this challenge. Unlike in *Eagle Hawk* (as to the evidence on the drug overdose) the evidence was first brought up in the defendant's case-in-chief. Having done so, he cannot now cry "foul," because the state attempted a balance to his accusations. A few pertinent questions to demonstrate some facts surrounding what occurred during one prior confrontation with the police were permissible in the context of this case to dispel the inferences created by the direct testimony.[7]

## V.

Two motions were filed by Byron seeking the appointment of investigators. The first motion requested assistance to interview people associated with the monetary system and particularly four who agree with his own views. The second motion requested an investigator to conduct a public opinion poll and to investigate a host of people who were at or involved in the auction. (The second request Byron made pro se; his counsel would not join in the motion.)

■ On the topic of appointing experts it was held in *State v. Sahlie,* 90 S.D. 682, 245 N.W.2d 476 (1976) that such an application must be timely, made in good faith, and be necessary for an adequate defense specifying the reasons for the services. A

trial court is not bound to appoint an expert, yet should give considerable weight to the application in its independent evaluation taking into consideration all relevant factors. *In accord, State v. Muetze,* 368 N.W.2d 575 (S.D.1985).

■ Byron's first motion fails because this request sought to interview only people familiar and sympathetic with his view on money. This issue though has been deemed immaterial under (I) previously and is a moot point.

The second motion fairs no better. Byron wanted an investigator to seek out and interview a host of people who either had property consigned to the auction or were just present. Why the interview? Byron never sets forth this needed point. Ownership of the property was already known to be in Peterson. There was no indication anyone else was involved in this particular auction sale except the owner and the auctioneer. When he went back with Lloyd, only Lloyd entered the building to pay for the $37,050.00 in property bought. Byron never denied the crime or his motives of these acts. Those who had information about the crimes were limited to a small cadre of conspirators as Byron had little trust in others unless they believed in his cause.

Byron requested an investigator to conduct a survey for a jury review to determine jury prejudice in Corson County. This request became moot when the trial was moved from Corson County to Lawrence County. There has been no showing of a need for an investigator to assist in preparing an adequate defense. All allowable witnesses were as available to Byron as to the state.

## VI.

Byron urges this court to remand the case for resentencing claiming that the sentence violates the principles of proportionality of the Eighth Amendment.

(Criminal) 1–15–9.

---

7. A proper limiting instruction was given by the trial court in its instruction #33. *See,* SDPJI

Under the facts of this case, Byron faced a possible fifteen years imprisonment. The crime of grand theft is a Class IV offense with a maximum penalty of ten years imprisonment or a fine of $10,000.00 or both. SDCL 22–6–1(6). An attempted grand theft carries one-half of the penalty or a maximum penalty of five years imprisonment, or a fine of $5,000.00 or both. SDCL 22–4–1(1). The sentences could have been imposed to be served consecutively. SDCL 22–6–6.1. Byron received a five year prison sentence on the grand theft and five years concurrent on the attempted grand theft.[8]

■ *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) removed the concept that no sentence is *per se* constitutional under all circumstances just because it is within the range of sentencing authority granted by statute. The proportionality test is divided now into two parts. Initially, the court must find the sentence to be one that shocks its conscience, or is so disproportionate to activate the Eighth Amendment. *State v. Weiker*, 366 N.W.2d 823 (S.D.1985). *State v. Andrews*, 393 N.W.2d 76 (S.D.1986). *State v. Lohnes*, 432 N.W.2d 77 (S.D.1988). Next, the sentence must be considered in proportion to other sentences in the same jurisdiction and allowable out-of-state sentences.

■ Under the facts of this case, the sentences were not out of proportion to the severity of the crimes committed. The evidence is clear that Byron knew he was about to commit the crimes, but did so purposefully so he could use the courts as his forum for his theory. He sought out three other confederates to assist in the crimes. He chose his innocent neighbor to be the victim—a person who had endured the rigors of ranching for twenty years and hoped to "cash out" just to avoid further debt. The crimes involved sums of $7,000.00 and $37,050.00 respectively. No attempt was made to return any items tak-

en. The severity of the crimes justified the sentence imposed.

The record reflects several sentences which Byron claims shows his sentences were disproportionate. The crimes involved were burglary and grand theft. In all cases, no prison time was ordered to be served, but all prison time was suspended and the sentence deferred to the county jail for a period of time with probation. The problem with this evidence is that it only gives the end result of the crime and no other evidence exists to show the reasons and factors for the sentence. For example, the other crimes may have involved theft of $500.00 or only $250.00 which resulted in the sentence given. These crimes then would not be in the same league as Byron's $44,000.00 plan to defraud his trusting neighbors. We are unable to draw any conclusions from the state of the record before us.[9] *State v. Weiker, supra,* 366 N.W.2d at 828.

As to out-of-jurisdiction sentences, we find in the surrounding states, laws and punishments nearly identical to South Dakota's: Minnesota (Minn.Stat.Ann. §§ 609.-52 and 609.17)—if value exceeds $5,000.00 a maximum ten year sentence. Montana (Mont.Code Ann. §§ 45–6–301 and 45–4–103) if value exceeds $300.00, a ten year sentence is allowed; an attempt may not exceed this maximum. Nebraska (Neb. Rev.Stat. §§ 28–518, 28–105 and 28–201)—if property exceeds value of $1,000.00, imprisonment for twenty-five years is allowed; an attempt may not exceed five years. North Dakota (N.D.Cent.Code §§ 12.1–23–05 and 12.1–06–01)—if the value of the property exceeds $10,000.00, a maximum sentence is ten years; an attempt is five years maximum. Wyoming (Wyo.Stat. §§ 6–1–304 and 6–3–402) if value exceeds $500.00 a ten year sentence is authorized; an attempt can secure the same sentence.

---

**8.** This is Byron's second case before this court on criminal matters. *See, State v. Dale,* 379 N.W.2d 811 (S.D.1985), a case involving obstruction of a law enforcement officer and resisting legal process.

**9.** The verdict, so to speak, on the use of raw statistical data to interpret the particular meaning of sentences is still subject to divisive debate. *See, e.g., McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

The sentence given in this case does not shock the conscience nor is it disproportionate to similar offenses in surrounding jurisdictions.

We have considered the remaining issues raised and find them without merit or covered by the other portions of this opinion.

WUEST, C.J., and MORGAN, HENDERSON and SABERS, JJ., concur.

KEAN, Circuit Judge, for MILLER, J., disqualified.