**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Willard HURST, Jr., Defendant and Appellant.**

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Telford TOFFLEMIRE, Defendant and Appellant.**

Nos. 18089, 18090.

Supreme Court of South Dakota.

Argued Sept. 1, 1993.

Decided Nov. 10, 1993.

Mark W. Barnett, Atty. Gen., Charles M. McGuigan, Asst. Atty. Gen., Pierre, for plaintiff and appellee.

Stan H. Anker, Rapid City, for defendant and appellant, Hurst.

Curt R. Ewinger, Rice and Ewinger, Aberdeen, for defendant and appellant, Tofflemire.

SABERS, Justice.

Defendants appeal their convictions for conspiracy to commit theft by deception and theft by deception. We affirm.

### 1. Theft by Deception [1]

State claims that defendants Willard Hurst, Jr. (Hurst) and Telford Tofflemire (Tofflemire) contracted with MDS to incinerate MDS' medical waste in Aberdeen, S.D. State further claims that Defendants buried the medical waste in Mellette County, South Dakota instead of incinerating it at Aberdeen as contracted, thereby deceptively obtaining substantial sums of money from MDS and that this conduct constituted conspiracy and theft by deception. Defendants deny State's claims and argue that their conduct merely amounts to a breach of contract. The jury agreed with the State. Hurst and Tofflemire appeal.

---

1. Because the issues on appeal are generally questions of law, relevant facts will be discussed in the opinion when necessary to resolve the issue.

Hurst argues that the trial court erred in denying his motion to dismiss Counts I and II of the Indictment, conspiracy to commit theft by deception and theft by deception. Tofflemire argues that the failure to incinerate the medical waste did not constitute theft by deception, but was simply the breach of a contract which had otherwise been substantially performed. SDCL 22–30A–3 provides in part:

> Any person who obtains property of another by deception is guilty of theft. A person deceives if with intent to defraud he:
>
> (1) Creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;
>
> (2) Prevents another from acquiring information which would affect his judgment of a transaction[.]
>
> . . . .
>
> The term "deceive" does not, however, include falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive reasonable persons.

According to Defendants, the State failed to prove theft by deception because, at the time that they, through their company TW Services (TWS), contracted with Medical Disposal Systems, Inc. (MDS) to provide incineration of their nonhazardous medical waste, they did not plan to bury the waste on Rodney Vollmer's (Vollmer) property. Defendants argue that they are guilty of a "simple breach of contract," rather than theft by deception.

"The statute requires acts of deception to obtain another's property. The statute goes on to require 'intent' and states that such 'intent to defraud' exists if a person 'creates or reinforces a false impression.'" *State v. Dale*, 439 N.W.2d 98, 107 (S.D.1989). According to the State, in order to obtain the property of MDS, Hurst and Tofflemire created the false impression in the mind of MDS that they would be incinerating its waste when in fact, they were planning on burying it. Defendants reinforced this false impression by writing on the trucking slip "Non Hazardous Medical Waste To be Incinerated at Destination Aberdeen S.D." and issuing fake incineration certificates. Defendants disagree, arguing that initially they intended to incinerate the waste, but decided at a later date to breach the contract and bury the waste.

■ According to the comments following § 223.3 of the Model Penal Code,[2] which is similar to SDCL 20–30A–3, breach of contract is not theft by deception. To constitute theft by deception, the actor must have the purpose to obtain the property of another, and he must have a purpose to deceive. Model Penal Code § 223.3 cmts. 1, 3(b) (1962). "It is only where the actor did not believe what he purposely caused his victim to believe, and where this can be proved beyond a reasonable doubt, that the actor can be convicted of theft." Model Penal Code § 223.3 cmt. 3(b).

Jury Instruction No. 22 provided in part that:

> The elements of the offense of theft by deception as charged in Count II of the Indictment, each of which the State must prove beyond a reasonable doubt, are:
>
> . . . .
>
> 3. That the Defendant obtained money with the intent to defraud by creating a false impression as to intention, specifically

---

2. Model Penal Code § 223.3 provides in part:
    A person is guilty of theft if he purposely obtains property of another by deception. A person deceives if he purposely:
       (1) creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise

shall not be inferred from the fact alone that he did not subsequently perform the promise[.]
    . . . .
    The term "deceive" does not, however, include falsity as to matters having no pecuniary significance, or puffing by statements unlikely to deceive ordinary persons in the group addressed.

that the medical waste would be incinerated properly; (but you may not infer deception as to the Defendant's intention to perform a promise from the fact alone that he did not subsequently perform the promise)[.]

Under SDCL 22–30A–3(1) and this instruction, the State had to prove that Defendants caused MDS to believe that TWS was going to incinerate the medical waste at Dependable Sanitation's (Dependable) facility in Aberdeen, when, in fact, Defendants knew it was going to be buried in Mellette County.

This case turns on this factual determination. "Where conflicting evidence is present, as in this case, and the credibility of witnesses is in issue, then it is a question of fact for the jury. The jury is physically present at the trial and, therefore, in the best position to judge the demeanor and credibility of the witnesses." *State v. Shank*, 88 S.D. 645, 226 N.W.2d 384, 387 (1975) (citations omitted).

On cross-examination, Vollmer testified as follows:

Attorney Curt Ewinger: When was the first time that you were approached by either Willard Hurst or Tel Tofflemire concerning this matter?

Vollmer: It was previous to the May 20th agreement.

Ewinger: How long before, approximately?

Vollmer: Six weeks to a month, somewheres in there.

Ewinger: Who contacted you?

Vollmer: Willard Hurst.

Ewinger: What did he say?

Vollmer: He told me about the idea of burying this garbage.

Ewinger: Are you sure he didn't tell you that they were looking for a site to put an incinerator to dispose of medical waste?

Vollmer: He never mentioned that to me that I can recall.

Ewinger: There was no mention to you about an incinerator at the May 20, 1989 meeting?

Vollmer: I don't remember them talking about incinerating.

Ewinger: You don't remember anybody talking to you about using your pole barn to store this medical waste until such time as there was an incinerator purchased or built?

Vollmer: I don't recall anything like that.

. . . .

Ewinger: And it was your idea to store it by burying it and then just covering it with dirt so you could easily dig it back up?

Vollmer: That wasn't my idea at all. It was their deal.

■ This testimony indicates that Hurst contacted Vollmer to discuss burying waste on Vollmer's property in April, 1989. And yet, TWS and MDS entered into a contract on June 20, 1989 which provided in part that "TWS agrees to provide incineration of all infectious waste material (Non–Hazardous) picked-up by TWS at MDS facilities or transferred to TWS's facility in Aberdeen, SD. TWS shall incinerate said medical infectious waste in a manner consistent with all Federal, State and Local laws and regulations governing the transport and proper disposal of this non-hazardous waste." John Meyers, President of MDS, testified that at the time he signed the contract, it was his understanding that the waste was going to TWS' facility in Aberdeen, South Dakota, and that it was going to be incinerated at that site. He further testified that he understood that the incineration would take place at Dependable, in Aberdeen, South Dakota.

Clearly, this failure to incinerate the waste was more than breach of contract. Defendants had the purpose to deceive. Their plan was to bury the waste on Vollmer's property and yet they purposely caused MDS to believe that the waste would be incinerated properly. The jury found that the State met its burden and the evidence supports that conclusion. *See generally Kansas v. Handke*, 185 Kan. 38, 340 P.2d 877, 883 (1959) ("It is a false pretense where a man represents himself to be in a situation or business in which he is not.").

Defendants argue that there was not a victim because MDS paid for, and received, the removal and transportation of its waste.

Therefore, they claim MDS did not suffer any financial loss and any alleged deception clearly had "no pecuniary significance." We are not persuaded.

■ A matter can have "pecuniary significance" without resulting in a financial loss. *See Arizona v. Mills*, 96 Ariz. 377, 396 P.2d 5, 8 (1964) (To constitute the crime of theft by false pretenses, the better rule is that there is no requirement that the victim suffer a pecuniary loss so long as he parted with his property. Financial loss is not a necessary element of the crime.). Defendants "focus on the wrong part of the transaction. They direct attention to what the victim obtains. The gist of the offense, however, is concerned with what the defrauder obtains. Once the victim has parted with his property in reliance on a false representation, it is immaterial whether whatever he got in return is equal in exchange value to that with which he parted." *Id. See also* Model Penal Code § 223.3 cmt. 3(d) (falsification as to matters having no pecuniary significance, such as where a salesman misrepresents his political, religious, or social affiliations, is excluded from the scope of the section). As Justice Learned Hand stated in *United States v. Rowe*,

A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him. *That is the evil against which the statute is directed.*

56 F.2d 747, 749 (2d Cir.1932) (emphasis added), *cert. denied*, 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932).

MDS was induced to part with its money because Tofflemire and Hurst represented that TWS would provide incineration at Dependable. That MDS' medical waste was removed and transported is not relevant. *Mills*, 396 P.2d at 8. That MDS paid for same is relevant. *State v. Yarber*, 285 N.W.2d 592 (S.D.1979), stated that the fraud intended is consummated by obtaining possession of the property sought by means of false pretenses. The victim is merely a witness whose ultimate financial gain or loss, in the circumstances, is immaterial. *Id.* at 594 (citations omitted). Defendants have failed to demonstrate error on the part of the trial court.

■ Defendants also argue that the jury was given conflicting jury instructions. Jury Instruction No. 22 provided the elements of the offense of theft by deception. Included as an element was that one or more Defendants obtained money belonging to MDS having a value exceeding $200.00. Jury Instruction No. 24 provided:

The crime of theft by deception is complete when by means of the deception the fraud intended is consummated by the Defendant obtaining possession of the property sought. The victim is merely a witness whose ultimate financial gain or loss in the circumstances is immaterial. Financial loss is not a necessary element of the crime.

Clearly, Defendants, with the intent to defraud, obtained over $200.00 of MDS' money. In fact, the sum was "in the neighborhood of" $80,000.00. Therefore, this deception had pecuniary significance. Whether MDS' financial position is ultimately better or worse for having been deceived is immaterial. *Id.* The instructions were neither conflicting nor error.

■ Hurst argues that the evidence was insufficient to sustain the convictions against him. In determining the sufficiency of evidence on appeal, the question presented is whether the record contains evidence, which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt. *State v. Miller*, 429 N.W.2d 26, 38 (S.D.1988) (citation omitted), *habeas corpus granted in part*, 1993 WL 172904 (D.S.D. March 24, 1993). We do not resolve conflicts in the evidence, pass on the credibility of the witnesses, or weigh the evidence. "These functions lie solely within the province of the jury as ultimate trier of fact." *State v. Burtzlaff*, 493 N.W.2d 1, 4 (S.D.1992) (citations omitted).

The record discloses sufficient evidence for the jury to find that both Hurst and Toffle-

mire entered into a contract with MDS to incinerate MDS' medical waste when they did not own or have access to an incinerator. Hurst's contact with Vollmer supplies sufficient evidence that Defendants had no intention of buying an incinerator.

Tofflemire argues that SDCL 22–30A–3 is unconstitutionally vague as applied in this case.

A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process. A criminal statute must give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden.

*Dale,* 439 N.W.2d at 106 (citation omitted). This court specifically discussed the constitutionality of SDCL 22–30A–3(1) in *Dale* and stated:

A review of the statute leads to the conclusion that SDCL 22–30A–3(1) is neither vague nor ambiguous. The statute requires acts of deception to obtain another's property. The statute goes on to require "intent" and states that such "intent to defraud" exists if a person "creates or reinforces a false impression."

*Id.* at 107. "Any intelligent person looking at [Tofflemire's] conduct as applied to this statute would find his actions prohibited and falling within the language of SDCL 22–30A–3(1)." *Id.* Tofflemire's argument fails.

## 2. Restitution

Finally, Defendants argue that the trial court erred by recommending to the Parole Board that they each pay $20,000.00 in restitution to the State as part of any parole plan for their convictions for conspiracy to commit theft by deception and theft by deception.

■ SDCL 22–6–1 and 22–6–2 authorize courts, in addition to the sentence imposed, to order a defendant found guilty of a felony or misdemeanor to " 'make restitution to any victim in accordance with the provisions of chapter 23A–28.' " *State v. Wolff,* 438 N.W.2d 199, 201 (S.D.1989) (quoting SDCL 22–6–1). While it is true that prior to Tofflemire and Hurst's delivery to the penitentiary,

the circuit court has jurisdiction to formulate a plan of restitution, once Tofflemire and Hurst enter the penitentiary, any plan of restitution under SDCL 23A–28–5 has to be created under the authority of the Board of Pardons and Paroles. *Id.* at 203–04.

SDCL ch. 23A–28 ... places the responsibility for preparing and distributing plans of restitution with the board of pardons and paroles. This is consistent with the principle of separation of powers enunciated in *State v. Oban,* 372 N.W.2d 125, 129 (S.D.1985): "[O]nce an offender is within the jurisdiction of the executive branch of government, the judicial branch—the circuit court—loses jurisdiction and control[.]"

. . . .

[T]rial courts may prepare plans of restitution when defendants are under its jurisdiction. However, once the defendant enters the penitentiary, the Board of Pardons and Paroles may prepare its own plan of restitution.

*Id.* (citation omitted).

As the State conceded during oral argument, any suggestion by the trial court to the Board of Pardons and Paroles was dicta. Because the trial court only suggested that Tofflemire and Hurst be ordered to make restitution to the State as part of any parole plan, and the Board of Pardons and Paroles is not required to follow the suggestion of the trial court in determining parole, we do not reach the issue of whether the State was a victim entitled to restitution.

We affirm.

MILLER, C.J., and WUEST and AMUNDSON, JJ., concur.

HENDERSON, J., concurs specially.

HENDERSON, Justice (specially concurring).

In concurring, I wish to elaborate upon my vote.

It is good that the majority opinion continues to remind the Bench and Bar of the seminal holding on restitution in *State v. Wolff,* 438 N.W.2d 199 (S.D.1989), and to

stick to it; so, also, it is to our credit as an institution to keep wary of the separation of powers of government, as reflected in *State v. Oban*, 372 N.W.2d 125 (S.D.1985).

In conducting a research of the record herein, I note that in the filed Judgment of Conviction dated September 16, 1992, settled record 488, 489, and 490, that these words appear: "It is recommended that the State Board of Pardons and Paroles order the Defendant to pay restitution to the State of South Dakota in the amount of $20,000 as part of the Defendant's parole plan." Without addressing such a provision, perhaps the Board would have directed the payment thereof.

At the sentencing hearing, the trial court made certain remarks concerning restitution, followed by abbreviated colloquy of counsel, set forth below:

> As to the matter of the State's request for restitution, the Court does not find at this time that there's a reasonable likelihood that a restitution plan could be carried out so at this time I'm not going to order that a restitution plan be prepared.
>
> However, on the felony part of the sentence *I'm going to order that if it's appropriate at the time that the defendants come up for parole, that a restitution plan be worked out by the parole people and that they pay restitution each individually to the State in the amount of $20,000.* Any questions about that? (Emphasis supplied mine).
>
> MR. LONG: No, your Honor.
>
> MR. EWINGER: No, your Honor.
>
> THE COURT: It's the Court's feeling that if the Court is sustained by the Supreme Court that the restitution then will be worked on at the time of parole. Of course, if the Court is reversed by the Supreme Court then the restitution will fall by the wayside. That's all.

This Court has sustained the trial court on the validity of the conviction. But has, in my opinion, by inference, reversed the trial court on the aspect of restitution of $20,000.

First of all, the Judgment of Conviction takes precedence over the oral pronouncement. An order is not an order until it is reduced to writing, signed by the court, attested by the clerk, and filed. *Mushitz v. First Bank of South Dakota*, 457 N.W.2d 849, 857 (S.D.1990). This is a civil citation, but *State v. Ford*, 328 N.W.2d 263 (S.D.1982) likewise holds that any oral sentence must be reduced to a written judgment. Likewise, SDCL 23A–27–4 states that judgments of conviction shall be signed by the judge and filed with the clerk.

I certainly agree with the majority opinion that the trial courts of this state cannot extend their powers of restitution beyond our holdings in *Wolff* and *Oban*. Nevertheless, I feel compelled to address other legal matters arising from this appeal.

State and appellants fully briefed restitution to the State of South Dakota, State contending that it was a "victim." South Dakota law requires that restitution be paid to the *victim* of the crime. SDCL 23A–28–1. SDCL 22–1–2(53) defines a victim as "any natural person against whom the defendant in a criminal prosecution has committed or attempted to commit a crime." In reviewing this file, it appears to me that the State of South Dakota was not the victim with respect to the felony convictions. Per the indictment, Medical Disposal Systems, Inc., was the alleged victim. Appellants also rely upon *State v. No Neck*, 458 N.W.2d 364 (S.D.1990), whereas State relies upon the language of SDCL 22–1–2(31) that a person includes "*this State*," emphasis added by State. One must distinguish the felony convictions from SDCL 22–6–2, i.e., pecuniary damages arising from a misdemeanor. Appellants did operate a solid waste facility without a permit. Even appellants point out that the state was a victim of the illegal waste dump, but strongly advocate that the State of South Dakota was not a victim of theft by deception or conspiracy to commit theft by deception.

When arguing this case before the Court, Attorney General Barnett was urged to check into the *civil lawsuit* which was filed by the State of South Dakota, a lawsuit filed prior to the institution of the criminal charges lodged against the appellants. A statement in a brief concerning this civil lawsuit prompted this writer to make such a

follow-up suggestion. Status of the civil lawsuit appeared to be unknown during oral argument and it was my belief then, and it is now, that the status be determined, for the sake of resolve and justice in this case. And all of this, not being the feigned imagination of this author, but to the contrary, was presented by the pleadings, briefs, and advocacy.